CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 1 6 2008

JOHN F. CORCORAN, CLERK
BY: /s/ J. Bright
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| WILLIAM H. MAKI, SR., Administrator of the Estate of William H. Maki, Jr. | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 7:07cv443 ) |
| UNITED STATES OF AMERICA, et al., | ) ) |
| | ) By: Michael F. Urbanski |
| Defendants. | ) United States Magistrate Judge |

### MEMORANDUM OPINION AND ORDER

In this case, plaintiff asserts that the death of a former patient at the Salem Veterans Administration Medical Center ("VAMC") was the result of medical malpractice and negligence by the United States under the Federal Tort Claims Act and a civil rights violation brought pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), against certain unknown VAMC agents. Plaintiff's decedent, William H, Maki, Jr., ("Maki") died following a scuffle in the psychiatric ward on June 4, 2006.

This matter is before the court on plaintiff's second motion to compel discovery. (Dkt. # 41). Defendants have lodged objections to plaintiff's requests for production of a number of documents and answers to certain interrogatories. Plaintiff subsequently moved to compel the production of the documents and answers to the interrogatories. The court held a hearing in this matter on April 9, 2008, and on April 11, 2008 granted in part and denied in part plaintiff's second motion to compel. The United States objected to the production of certain documents on a variety of privilege grounds, and the court ordered these documents produced for *in camera* review.

Pursuant to the April 11, 2008 order, the United States provided the court with a notebook of claimed privileged documents. The United States arranged the documents in three tabs, arguing that statutory privilege applied to Tab 1, attorney-client and work product privilege applied to Tab 2, and that work product and law enforcement investigatory privilege applied to Tab 3. Tab 1 consists of a Root Cause Analysis (Privilege Log #1), Salem VAMC Hospital Incident Report (Privilege Log #2), and documents identified as VHA Pre-Issue Brief, VHA Issue Brief, Addendum Issue Brief Update (Privilege Log #32). The United States argues that this information is protected from discovery by application of statutory privilege under 38 U.S.C. § 5705. Tab 2 includes physician peer review (Privilege Log #3) and nursing peer review (Privilege Log #4) documents, which the United States argues were prepared in anticipation of litigation and are thus protected from discovery under the attorney-client privilege and the work product doctrine. Tab 3 is comprised of the Veterans Administration ("VA") Office of Inspector General ("VA-OIG") Report of Investigation (completed) (Privilege Log #95), the VA-OIG Report of Investigation (closed) (Privilege Log #96), the VA-OIG Investigative Transaction Report (Privilege Log #97), and VA-OIG Investigative Synopsis (Privilege Log #98), which the United States argues is protected from discovery by the law enforcement investigatory privilege and work product doctrine. For the reasons below, it is hereby **ORDERED** that all materials in Tabs 1 and 2 are privileged and not discoverable, but the materials in Tab 3 identified as Privilege Log #s 95, 96 and 98, which contain the VA-OIG Comprehensive Report of Investigation and the Investigative Synopsis, **SHALL** be produced to Plaintiff by the United States before the depositions scheduled for April 17, 2008. Those materials shall be produced pursuant to the Agreed Protective Order entered on April 15, 2008.

## I. Tab 1 Materials

The United States argues that the materials produced in Tab 1 are protected from discovery by 38 U.S.C. § 5705. By statute, any records or documents created by the Department of Veterans Affairs as part of a medical quality-assurance program are privileged and confidential. 38 U.S.C. § 5705(a). Under 38 U.S.C. § 5705(d), the Secretary is authorized to promulgate such regulations as deemed necessary to effectively administer the provisions of 38 U.S.C. § 5705. 38 C.F.R. § 17.501(a)(2) prohibits disclosure of "focused reviews which address specific issues or incidents and which are designated by the reviewing office at the outset of the review as protected by 38 U.S.C. 5705." Id. Further, 38 C.F.R. § 17.501(b) requires that medical quality assurance programs subject to the provisions of 38 U.S.C. § 5705 be designated as such, in advance and in writing, by the Under Secretary for Health, Regional Director or facility Director.

    A.    <u>Root Cause Analysis</u> (Privilege Log #1)

With regard to the Root Cause Analysis ("RCA"), it is clear that it meets the requirements of 38 C.F.R. § 17.501(a)(2) as it plainly appears to be a "focused review" addressing a specific incident. Moreover, the requirement for advanced written designation set forth in 38 C.F.R. § 17.501(b) is satisfied by VHA Directive 2004-051. That Directive, entitled "Quality Management (QM) and Patient Safety Activities That Can Generate Confidential Documents," makes all RCAs privileged under 38 U.S.C. § 5705 when commenced to investigate a specific incident and which are designated as confidential and privileged under 38 U.S.C. § 5705 by the responsible office at the outset of the review. VHA Dir. 2004-051, ¶ 4a(2)(d). This requirement is satisfied by the Charter Memorandum authored by Carolyn Adams, Salem VAMC Associate

Director, on June 6, 2006, ordering the RCA and designating it as a "quality assurance, focused review" process which is considered confidential, privileged and protected under the statute. As such, the RCA falls within the statutory privilege outlined in 38 U.S.C. § 5705 and is protected from discovery.

    B.    <u>Salem VAMC Hospital Incident Report (Privilege Log #2) and Issue Brief Materials (Privilege Log #32)</u>

The United States argues that these materials also are protected from production in discovery under 38 U.S.C. § 5705. On its face, the Salem VAMC Hospital Incident Report (Privilege Log #2) states that "[t]his document was generated for the performance improvement program and is considered confidential and privileged under the provisions of 38 U.S.C. 5705 and its implementing regulations." Under 38 C.F.R. § 17.501(a)(1)(xii), monitoring and evaluation reviews conducted by a facility, including "[r]eports of special incidents (VA Form 10-2633 or similar forms) and follow-up documents unless developed during or as a result of a Board of Investigation" are confidential and privileged.[1] The United States argues that the writing requirement of 38 C.F.R. § 17.501(b) is satisfied by Veterans Health Administration ("VHA") Handbook 1050.1, VHA National Patient Safety Improvement Handbook, January 30, 2002 ("VHA Handbook"). The United States points to ¶ 6.d. of the VHA Handbook which reads:

> Any report of an Adverse Event, Sentinel Event, or Close Call, as defined in subparagraphs 4a, 4b, and 4c, received by the PSM or

---

[1] There is no suggestion that this VAMC Hospital Incident Report was developed "during or as a result of a Board of Investigation," 38 C.F.R. § 17.501(a)(1)(xii), therefore the exception for such reports does not apply.

4

designee is protected from disclosure under 38 U.S.C. § 5705, as part of a medical quality assurance program.[2]

VHA Handbook, ¶ 6.d. The VHA Handbook defines Sentinel Events as "unexpected occurrences involving death, serious physical or psychological injury, or risk thereof." Id. at ¶ 4.b. Maki's death qualifies as a Sentinel Event and therefore falls under the auspices of ¶ 6.d. Consistent with this VHA Handbook provision, the VAMC Hospital Incident Report on its face indicates that it was received by the Patient Safety Manager ("PSM") as required by ¶ 6.d. Indeed, the VAMC Hospital Incident Report reflects the comments of the PSM. Further, the Salem VAMC Hospital Incident Report contains a Safety Assessment Code Matrix (SAC) score. As set forth in ¶ 6.c. of the VHA Handbook and the Schematic entitled "Figure 1. A Detailed View of the Root Cause of Analysis Process," VHA Handbook at 9, the SAC score is an integral part of the "systematic healthcare review," 38 C.F.R. § 17.501(a), process. Finally, it is clear in this case that the Salem VAMC Hospital Incident Report was a precursor to the RCA as that document indicates on page 5 that "RCA already in process." As such, confidentiality

---

[2]Paragraph 6.d. of the VHA Handbook contains a second sentence as follows: "The only exception to this protection would be in the case of an intentionally unsafe act as defined as a criminal act; a purposefully unsafe act; an act related to alcohol or substance abuse by an impaired provider and/or staff; or events involving alleged or suspected patient abuse of any kind (see subpar. 4d)." Subparagraph 4.d., in turn, states that "[i]ntentionally unsafe acts are to be dealt with through avenues other than those defined in this handbook (i.e., Administrative Investigation (AI) or other administrative methods as determined by the facility Director and by applicable directives and regulations)." The United States argues that "the death of Mr. Maki was not reported under this provision," see Letter dated April 14, 2008 in response to the court's email inquiry, at 2, and that assessment appears to be correct. Page 5 of the Salem VAMC Hospital Incident Report indicates "RCA already in process" which supports the government's argument that this document was done as part of the Salem VAMC's "process of conducting systematic healthcare reviews for the purpose of improving the quality of health care or improving the utilization of healthcare resources in VA healthcare facilities." 38 C.F.R. § 17.501(a). There is no suggestion in this document that the Maki incident was considered by the persons authoring or commenting on the Salem VAMC Hospital Incident Report to fall under the exception for an intentionally unsafe act, nor is there any indication that an Administrative Investigation (AI) or other administrative method was employed by the Salem VAMC in connection with this incident. As such, the exception set forth in the second sentence of VHA Handbook ¶ 6.d. is inapplicable to this case.

5

protections outlined in the VHA Handbook, 38 C.F.R. § 17.501(a)(1)(xii), and 38 U.S.C. § 5705 plainly apply to this document.

The same is true for the documents collected under Tab 1 and identified in the Privilege Log at # 32 as "Pre-Issue Brief," "VHA Issue Brief," and "Addendum: Issue Brief Update." The United States asserts that these documents are "reports sent by Salem VAMC supervisors to the supervising VISN office. The purpose of these reports is to implement the subordinate DVA office's reporting requirements to its supervising DVA office as required by VHA Handbook 1050.1, par. 6a." See Letter dated April 14, 2008 in response to court's email inquiry, at 2. VISN refers to the Veterans Integrated Service Network, and VHA Handbook ¶ 6.a.(2) requires that Veterans Administration facilities report all Sentinel Events to the National Center for Patient Safety ("NCPS") and to the local VISN if required by local VISN policy. Review of the documents collected at Privilege Log # 32 confirm that they are precisely these sorts of documents. As such, they are privileged and confidential under 38 U.S.C. § 5705 and 38 C.F.R. § 17.501(a).

## II. Tab 2 Materials

Tab 2 of the materials produced by the government pursuant to the April 11, 2008 order consists of physician peer review and a nursing peer review materials. The United States argues that this material is protected from discovery based on the attorney-client privilege and the work product doctrine.[3]

---

[3] Although not raised by the United States, the court considered whether these peer review documents are subject to the same statutory protection afforded the documents under Tab 1. 38 C.F.R. § 17.501(a)(1)(ix) includes "Tort claims peer reviews" as a class of confidential quality assurance document which may not be disclosed under the statue. VHA Directive 2004-051, however, explains that these materials are not subject to statutory protection, as follows:
(a) <u>Tort Claim Peer Review</u>. This is the review of the care provided in cases in which malpractice claims have been filed to identify, evaluate, and, where appropriate, correct circumstances having the potential to adversely

6

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The privilege serves to protect confidential communications between a client and attorney in order to facilitate full and frank disclosure. Hawkins v. Stables, 148 F.3d 379, 383 (4th Cir. 1998). Because the privilege is an impediment to "full and free discovery of the truth," it is to be narrowly construed. Id. (quoting In re Grand Jury Proceedings, 727 F.2d 1352, 1355 (4th Cir. 1984)). To determine the applicability of the privilege, the Fourth Circuit has adopted the following test:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

Id. (quoting United States v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (Mass. 1950)). For the attorney-client privilege to apply, the burden is on the party asserting the privilege to establish its applicability. United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982). "The proponent must establish not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." Id. When dealing with a government agency like the Veterans Administration, the

---

affect the delivery of care. *NOTE: Reviews conducted entirely for other purposes, such as assisting the United States in consideration of tort claims or in defense of litigation under the Federal Tort Claims Act, are not included.*

7

client is the agency and the attorney may be an agency lawyer. See Syngenta Crop Prot., Inc. v. United States EPA, 2002 U.S. Dist. LEXIS 22885, 14 (M.D. N.C. 2002).

The only information provided by the United States in support of its contention that the attorney-client privilege applies to the physician and nursing peer review documents is that "these reviews and reports were prepared at the request of Kathleen Oddo, Attorney, Office of VA Regional Counsel, for use in the performance of her duties as an attorney for the DVA. Should the Court require more information regarding these documents, the United States request the opportunity to have Ms. Oddo provide that information directly to the Court." Letter dated April 10, 2008 accompanying material for in camera review.

There is no indication from this brief assertion or from the materials themselves that they were communicated to an attorney for the purposes of seeking legal advice. Hawkins, 148 F.3d at 383 (holding that the privilege only applies when the communication between counsel and client is for the purpose of securing either an opinion on law, legal services, or assistance in some legal proceeding). The United States' bald assertion that certain documents were "prepared at the request" of counsel "for use in the performance of her duties as an attorney for the DVA" does not meet its burden of establishing that these documents are privileged from discovery under the attorney-client privilege. The mere fact that counsel requested certain documents to be prepared does not, in and of itself, meet the government's burden of establishing that the attorney client privilege applies. For the privilege to apply, there must be a communication between the client and its counsel for the purpose of seeking legal advice. While the United States asserts that Ms. Oddo was counsel for the VA and that she requested these documents for use in the performance of her duties, there has been no assertion, much less any showing sufficient to meet

its burden, that these documents were communicated to counsel for the purposes of seeking legal advice. As such, the United States has not demonstrated that they are protected from discovery under the attorney-client privilege.

However, the documents themselves establish that they are protected from discovery under the work product doctrine. Under Fed. R. Civ. P. 26(b)(3), materials otherwise discoverable are exempt from production when they are prepared in anticipation of or during the course of litigation. In addition to the substance of the documents, the timing of their creation compels the conclusion that these documents are subject to work product protection.

Both documents are headed as follows: "TORT CLAIM INFORMATION SYSTEM PROVIDER INFORMATION PEER REVIEW AND CORRECTIVE ACTION FORM." Also, the instructions on how to complete the form note that the "reviewing practitioner . . . who has been selected to do a peer review of this case should [focus] specifically on the issues surrounding the tort claim." The second question of the peer review form directs the responding practitioner to "provide a brief summary of the salient features of this case which are pertinent to the issues surrounding the tort claim." Plainly, the use of the phrase "tort claim" supports the position of the United States that these reports were generated in anticipation of litigation.

Significantly, the text of the physician peer review makes numerous references to the pending tort claim. Indeed, in the very first paragraph of the review, the physician notes make reference to "the plaintiffs or their legal team." At another point in the review, the reviewing physician comments on a "legal aspect of this case." It is clear that these documents were created in anticipation of litigation.

9

The timing of these peer reviews confirms the applicability of work product protection. Plaintiff filed notice of the tort claim with the VA on October 12, 2006. The physician peer review was created January 12-19, 2007 and the nursing peer review was created sometime after December 18, 2006,[4] which establishes that both documents were created after plaintiff filed the administrative notice.

It is plain from both the substance and the timing of the physician and nursing peer reviews that work product doctrine applies to them. Materials which are protected from discovery under the work product doctrine may be discovered upon a showing of substantial need. At oral argument, plaintiff suggested that substantial need may be met here due to the passage of time and the need to get factual information concerning this incident obtained closer to the date of the incident. On balance, and given the fact that the court is ordering production of the VA-OIG report and its attachments which contain timely factual information about this incident, it does not appear that plaintiff can meet its burden of showing substantial need for the peer review reports. As such, given the production of the VA-OIG reports, the peer review materials need not be produced.

### III. Tab 3 Materials

The last group of materials produced to the court for *in camera* review is the VA-OIG Report of Investigation (completed) (Privilege Log #95), the VA-OIG Report of Investigation (closed) (Privilege Log #96), and the VA-OIG Investigative Transaction Report (Privilege Log #97). The government argues that this information is protected from discovery because it is both

---

[4] While an exact date is absent from the nursing peer review, the author relies on internal VAMC memorandum dated December 18, 2006. Obviously, therefore, the document was prepared sometime following that date, which was two months after the tort claim notice was filed.

10

work product and subject to the law enforcement investigatory privilege as created by common law.

The common law investigatory privilege afforded to law enforcement is a qualified privilege. Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1341 (D.C. Cir. 1984). The Friedman court struck a balance between the public interest in non-disclosure against the private litigants need to obtain the information from the governmental agency. 738 F.2d 1341. The Friedman court lists the following factors as relevant in determining whether the qualified common law privilege applies:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case.

Id. at 1342-43 (quoting Frankenhauser v. Rizzo, 59 F.R.D. 339, 344 (E.D. Pa. 1973)).

In this case, factors 1, 2, 3, and 4 do not weigh against disclosure. There is no threat that production of this report will discourage citizens from cooperating in investigations, this factor is obviously directed towards the revelation of confidential sources. Factor 2 is not an issue in this case because the identities of the individuals who provided information has already been provided to counsel. Factors 3 and 4 do not weigh against disclosure, because the information in

11

the report is factual and the government has not argued with the deliberateness and specificity required to satisfy their burden that such information is privileged. Factor 5 is inapplicable to the case at bar, as the party seeking discovery is deceased. Factor 6 weighs for disclosure as the investigation is now complete. Factor 7 also weighs in favor of disclosure as there has been no suggestion that there have been any disciplinary proceedings that were initiated as a result of the investigation. Factor 8 also weighs in favor of disclosure. Indeed, at the hearing, the United States expressly declined to argue that the suit was frivolous or brought in bad faith. Factors 9 and 10 also both weigh in favor of disclosure because this information is not available through any other source and is very important and relevant to the plaintiff's ability to discover the facts surrounding Maki's death. As such, these materials should be provided to the plaintiff as the qualified common law investigatory privilege does not apply.

The argument that this information is protected by the work product doctrine is equally unconvincing. The United States does not claim that this information was created in anticipation of this civil litigation, but rather that it was created in anticipation of a possible criminal prosecution which never occurred. The work product doctrine does not apply to protect the investigatory report of a criminal investigation under these circumstances. Miller v. Holzmann, 2007 U.S. Dist. LEXIS 16117, 5 (D.D.C. 2007)("even if one could consider a criminal investigation as potentially anticipating litigation because it may lead to indictment and trial, the materials in the file are, at best, fact work product and available upon a showing of substantial need because there is no substitute. . . . The need of these defendants to see this file to, for example, impeach witnesses with prior inconsistent statements or to learn of potentially exculpatory witnesses is obvious and there is no substantial equivalent to the agents' notes."). In

12

Miller, the court ordered the production of closed FBI investigatory files that were created to explore the possibility of a criminal prosecution. Id. at 4. The Miller court noted a distinction between materials prepared for criminal, as opposed to civil litigation. Id. Because the materials in Miller were created in anticipation of a possible criminal indictment and trial, as opposed to the actual civil litigation which ensued, the court found the work product doctrine inapplicable. Id. at 5. Similarly, the materials at issue here were created to determine whether to pursue criminal charges against any individuals involved in the incident and not in anticipation of this civil litigation. Based on the sound reasoning in Miller, the work product doctrine does not preclude production of the Comprehensive Report of Investigation done by the VA-OIG and the investigative synopsis. Even if that doctrine were to apply, plaintiff has demonstrated substantial need for these OIG materials as they provide a timely and detailed factual investigation of this incident, the substantial equivalent of which is not available to plaintiff from any other source.[5]

Accordingly, the United States is **ORDERED** to produce to plaintiff the materials found at Tab 3 and identified as Privilege Log #s 95, 96 and 98 prior to the depositions scheduled for April 17, 2008. These materials shall be produced pursuant to the Agreed Protective Order entered on April 15, 2008.

---

[5] By the same token, the court is not ordering production of the interim status reports done by the VA-OIG referenced at Privilege Log # 97 and separately produced to the court for *in camera* review by e-mail dated April 14, 2008. Those documents detail the government's Investigative Plan and, at various points, the interim status of the investigation. This information is largely duplicative of the completed VA-OIG report.

13

The Clerk of the Court hereby is directed to send a copy of this Order to all counsel of record.

Enter this 15th day of April, 2008.

/s/ Michael F. Urbanski
Michael F. Urbanski
United States Magistrate Judge